Please be seated. Thank you. Clerk, please call the first case of the morning. 116-6050-17. 345-6080. Counsel, you may proceed. Thank you, Your Honor. May it please the Court, Ms. Turnbull. I am Jim Tyrrell, and I represent the Appellant, Hugo Gonzalez. The issue in this case is whether the Commission's decision that the Appellant failed to prove accidental notice was against the manifest way of the evidence. I submit there was not a sufficient evidentiary basis for the Commission's decision, and I emphasize the word sufficient. By way of introduction, Your Honors, Mr. Gonzalez testified that he was delivering Chinese food in Lansing, Michigan, on March 17, 2016, while using a two-wheeled hand truck. One of the hand truck wheels came off while he was coming down a ramp loaded with food, causing him to fall off the ramp and strike the ground primarily on his left knee. He finished his shift. He came back and told the dispatcher of the accident that night. Six days later, when his boss returned from vacation, he told the boss. Now, it's undisputed that on March 9, 2016, eight days before the accident, Mr. Gonzalez brought the same hand truck into the employer to have it repaired because the right wheel was shaking. The boss sent him a text message that night, this is before the accident, saying that the mechanic would work on the hand truck that evening. Now, Mr. Gonzalez's ex-girlfriend was subpoenaed into the Commission, and she testified to seeing him the night of March 17, 2016. That's the accident date. Let me see if I can just sort of simplify it here. The claimant testified that he told Chen in his alleged accident on March 17, correct? Yes. Chen did not testify in this case, correct? I'm sorry, who didn't testify? Chen. No. He did not testify. He's the Respondent's dispatcher. Then there was a text message from Mr. Nagy on April 1st stating that Mr. Chen needs to know your leg's feeling better. So you're arguing that corroborates his testimony that he gave notice of the alleged accident, correct? Both notice and the accident itself. So what's the evidence on the other side? Is there any on that issue? On notice? Yeah. On notice, well, Mr. Nagy came and testified that I don't remember hearing anything about this. He never came and told me what happened. So going back to where we were, the ex-girlfriend sees him come home the night of the accident limping, bruising, and swelling. She's the ex-girlfriend. I subpoenaed her into court. It's never a certain thing when you subpoena in an ex. Now, Mr. Gonzalez toughed it out. He worked eight of the next 12 days but did no out-of-state driving. He sought emergency room care on March 29, 2016, complaining of bilateral knee pain falling onto his knees while delivering food at a Chinese restaurant three weeks earlier. He was diagnosed at the hospital with left knee swelling. Three days after this visit, as you started mentioning, Justice Hudson, on April 1, Gonzalez receives a text from his employer asking him whether his leg felt better and whether he'd be able to work the following day. Now, his surgeon, Dr. Markarian, testified that Gonzalez had sustained a traumatic, not a degenerative injury, which was progressively worsening like a crack on a window pane. Gonzalez was not asked a single question on cross-examination, exploring the facts of the accident itself, and the entire record before you does not contain a shred of evidence suggesting how his left knee was otherwise traumatically injured or what else brought him into the emergency room on March 29, 2016. We're getting ahead of ourselves. On the notice, okay, you've got, you know, I think a stronger argument on that issue perhaps than some other issues. But what was why did the commission then find that he didn't get notice of accident in light of this unremitted testimony? I think the commission ignored the text message. I think the commission ignored the direct evidence from the appellant. He came in that night. The reason why he came in that night was not necessarily to document this claim. He came in because he was angry. And why was he angry? He was angry because he asked them to fix this hand truck, and they didn't do it or did it improperly. I think he even said, I don't want an accident. I don't want to be an old man. So he comes in that night because he's angry. He not only told them about the accident, he showed them that the knee was swelling. Now, that was Mr. Chen who didn't come into the court. Mr. Nagai did. But this was two years later, and if you read his testimony, he doesn't remember anything about the accident, doesn't remember being told about it. And I suggest the reason for that is because this just wasn't serious enough for him. It wasn't a bone sticking out or somebody bleeding. And if you read his testimony, you can see the way that he just didn't take it seriously enough. And because my client did keep working. I'll concede that. If you get past the notice issue, what about the commission's determination that Clement failed to prove that he suffered a work accident on March 17th, 2016? Well, the commission, I have two parts to my argument about whether this happened. Three things the commission did that was how this argument's against the manifest, how the decision's against the manifest weight. And I have five reasons why the decision was, why the decision was against the manifest weight. First of all, the commission discounted Gonzalez's clear and convincing testimony as to the cause and effect of the accident. He didn't trip, stumble, or fall, but he could identify with specificity what caused the accident, a broken hand truck, a fact indisputably corroborated by the employer's text message. Can I ask you a question? Yes, sir. He first sought medical treatment for the knee on March the 29th, 2016. Is that correct, 12 days after the alleged accident? Yes, sir. And then from March the 29th, 2016, all the way until June the 14th, 2016, he never sought any medical treatment for this leg, although he testified on a scale of 1 to 10 his pain was at level 9. He knew it was terrible. He knew it was getting worse, and he worked his regular shift. Now, based on all that, do you think the commission could turn around and say, we just don't believe you? No. He didn't have any insurance. He's one of the 20 million people in this country that don't have any insurance. He was trying to put this claim through comp, and they kept ignoring him. He kept working. When did he try and put it through workers' comp? He came in the night of the accident. He came in, presumably, after the emergency room care and told somebody because that prompted the text message. And he tried all through April to put it. He testified. I came to Veronica. Veronica's the assistant at the warehouse asking for comp, and they kept ignoring him. It just wasn't serious enough. Look, what wasn't serious? From his point of view, it wasn't serious. He said his pain level was nothing on a scale of 10. I think the problem you got is he was embellishing so much that the commission just said, we don't believe you at all. And the records, by the way, do not necessarily zero in on an accident occurring on the date he said it occurred. The hospital records suggest it happened three weeks before, something on that date, which would have put it way before the date that he claimed. He said he reported injury, making deliveries back in February 2016. Doesn't that contradict his claim? No. What happened is when he first comes into the emergency room, this is on March 29th. That's Bayward's note of June 14, 2016, way back in February. Here's my point with these things, is that he comes in on March 29th. The accident occurs 12 days later. He tells them or they enter it as three weeks earlier. I suggest that the difference between 12 days, March 29th to March 17th, and three  And I think that's a good thing, but I don't think it would be fair to assume that somebody in this man's situation, I feel it wouldn't even be expected given his educational  I'm sure it's fair. But how do you explain, assuming that's true, how do you explain Bayward's note that the claimant reported the injury occurred when he fell, making a delivery back in February? Okay. What's the misinterpretation on that? When he comes to Bayron on June 14th, that's three months after the accident. Describing on June 14th an event occurring on March 17th as three months earlier, it's a good best estimate. He's putting it in the ballpark. He doesn't have this scripted down. He said back in February, the claimant allegedly said it happened back in February, not weeks ago. Right. It's weeks ago to the emergency room, but when he comes to Bayron on June 14th, it's in the doctor's notes, February. And what I submit is that a working man, this man doesn't even have a GED, telling that it happened in February when it happened on March 17th. That's all in the ballpark. That's a good-faith estimate for somebody. But how do we know that? How do we read that into the statement? Where does the commission draw that inference? The commission didn't draw that inference. The commission ignored that. And I'll tell you the reason why. But better yet, isn't it for the commission to resolve those discrepancies and dates? Aren't they in a better position than we sitting here to determine the credibility of these statements and the dates? All right. The commission was against the man with his weight. I'll tell you why. The commission made a mistake with this. The commission thought that this man knew that this accident happened on St. Patrick's Day. This isn't a trivial point. If you look at the whole record, only the ex-girlfriend knew it happened on St. Patrick's Day. This is what happened. If he knew that the accident occurred on St. Patrick's Day, which is what the commission attributed to him, if he knew that and that he also had to cancel his plans, that would have been the first thing out of his mouth when he comes in on March 29th. But because the records note three weeks, instead of St. Patrick's Day and canceled his holiday plans as the commission thought, then Dr. Byron should have said March 17th, an accident day, instead of February. But where are you getting the should have said? If the man tells him it happened back in February, doesn't the doctor, is he supposed to record what he's told by the claimant? What is this?        I don't know. I don't know. I don't know. I don't know. I don't know. It was in March. But it didn't happen in March. The hand felt was broken. The claimant said it happened in February. Right. The claimant said it happened in February. It's in Dr. Byron's notes in February because when he comes in on June 14, maybe he says it's three weeks ago, maybe he said February 29th. It's in the notes in February. Wait a minute. Wait a minute. He took that one away from you. I'm sorry? He took that away from you. In Byron's notes, he said way back in February 2016. In the therapist's notes, it says February 1st, 2016. Your client took the witness stand and said he didn't tell either of them it happened in February. So the commission would ask the question, from whence did they get the idea that it happened in February? Well, he more than likely said that it happened in February when he came in to Dr. Byron. But he never said February 1st. And that's what he testified to. I never told anybody it was February 1st. When I saw that it was February 1st, I went and made it and I looked at my truck logs to see what date it's happened. And then I extrapolated and I figured out it happened on March 17th. All this happens. This man comes in in June and says February. We're going to discount his every other bit of his testimony? The commission thought that this man knew about St. Patrick's Day. That colored their entire decision. Well, who judges the credibility of the witnesses? And by the way, didn't the commission also have some problems with the credibility of his girlfriend? For the credibility of the girlfriend, the reason they had a problem with her is because of addresses that were put in the medical records for Gonzales. That's the only thing the commission could bring out about the girlfriend is that she said at the time of the accident, I lived with him in Cicero. With Gonzales' medical records, for whatever reason, it's completely speculative as to why addresses are in the medical records. Gonzales' records say he lived in Schaumburg. So they're discrediting her by records that are in medical or addresses put in the medical records for Gonzales. That's not even an impeachment of Gonzales. Whatever addresses he puts in the medical records, it's speculative as to why he may have put a different address. Wait a minute. It's speculative as to why you would put your own address in a medical record? Some people like to be billed. Maybe he didn't want his parents to. Maybe he was telling the truth. That's where he lived. And maybe she – maybe the commission turned around and thought the idea she wasn't when she said she lived with him in Cicero. That's – with all due respect, Judge, I think the commission was flat-out wrong in that. To impeach – and that's collateral impeachment. To impeach a witness by something that another person put in records, she didn't author these. She said, I lived with this man in Cicero. There's no doubt that they lived together the night of the accident. Are you saying that we can ignore the commission's credibility assessment and substitute our own assessment for the credibility? Is that what you're suggesting? I'm suggesting that there's five mistakes that the commission made. One of them was the St. Patrick's Day. The other was that the truck logs – they used the truck logs to impeach this man when there was no impeachment value at all. The other one was the – as I mentioned, the impeachment they have of a girlfriend for an address put in the records from somebody else. And as well as a text message that came in July written on Mr. Gonzalez's phone. The commission cited that in their credibility assessment. They're impeaching a phone. What this case comes down to, if I can use an analogy, this case – I'm not in front of you saying that 99 witnesses said that the light was green. Please don't quote the defense witness that said that the light was red. If I had that situation, I wouldn't be here. What I have is I have cameras on either side of the intersection showing that the light was green. I have a text message before. I have a text message after. The text message before proves that that hand truck was broken. What does Gonzalez say? The hand truck was broken, and that's how I fell off the ramp, in between. What does the text message say afterwards? They knew that his leg was injured. How did the leg get injured? Within 23 days between the two text messages. He testified clearly and convincingly. Was he a perfect historian? No, of course not. But I'll venture to say that 90% of the claimants that come in front of you probably have similar histories. But do we discount this man's testimony because he's inaccurate by March 17th saying that it happened three weeks ago and June 14th saying it was February? That's the only thing the commission latches on to in their Bayron description, which was otherwise very accurate. What I have here is I have five mistakes made by the commission that skewer their credibility assessment. One was St. Patrick's Day. I think that threw the whole case on its head. They mistakenly thought that he knew about St. Patrick's Day. The whole case got colored with that one. Then there was the man trying to work through his act of the accident to keep working through. Going back to what you asked about the pain level, I have an uneducated man. He's going to say the pain is 9 out of 10. That's what it felt like to him. He's testifying two years later saying that the pain was 9 out of 10. If this was a nature and extent case, then perhaps he's embellishing the 9 out of 10 pain and maybe he's not entitled to what he's entitled to. But the only issue in front of Your Honors is accident. Did I or was the commission's decision that I didn't prove accident was that against the manifest weight? I suggest there's five mistakes the commission made. I've laid it all out on my brief. I think that's five reasons why they didn't prove accident, why it was against the manifest weight, and I have three reasons how it was against the manifest weight. They did not put the accurate attention to those medical records, which were fairly corroborative. Yes, they had the dates that were off, but we see that in many cases that come in front of Your Honor, I imagine. We don't have perfect historians as claimants. We have working people who don't pay exact attention to detail. They're out there working for a living, and they're not out there reporting exact things down. Your time is up, Your Honor. You may reply. Thank you. Counsel, you may respond. Good morning, Your Honors. May it please the Court, Mr. Turell. I'm Amy Turnbow, and I'm here on behalf of the defendant in this matter, A&D Logistics. As Your Honors brought up the issue of notice, I'd actually like to submit that when you take the totality of the record and you walk through the timeline of this claim and note that in terms of the Petitioner working, whether or not anything happened on March 17th, 2016, it's all evidence to the contrary until the issue of accident, not notice. It does, but the issue of notice. He testified that he told Chen it was unrobotic. He never called Chen to contradict him. There is no evidence in this record that he did not tell Chen on the night of the accident. So I'm at a loss to understand how the Commission came to the conclusion he failed to prove notice. Within the testimony of the Petitioner, but then looking at the record with the first goes and seeks medical treatment on March 29th, 2016, the history he gives us that it happened three weeks ago. That doesn't support March 17th. Hold on. There may be evidence in the record that there was no accident on March 17th. The question is, did he give notice of an accident on March 17th? If the answer to that question is yes, then we proceed on to the question as to whether that accident ever actually took place. This is a question of, did he tell his employer that he had an accident while working on March 17th? He said he told Chen, and there's no evidence in the record to the contrary. That doesn't mean it happened. It only means he told him. And it goes beyond that. How do you explain the guy's text message on April 1st saying, Mr. Chen needs to know if your leg is feeling better? How would the guy, what would be prompting him to send the text if Chen had never received notice? How could you explain that? I honestly have no idea what the timeframe of that would be. It could have to do with the fact that the petitioner had gone to the emergency room on March 29th and may have said something. But you're not denying that the guy sent the text, are you? I'm not denying that he sent a text, but there's no reference to know what that text is in reference to. Mr. Chen wants to know if your leg is better. That's what it's in reference to. Correct. But it doesn't reference that there has anything to do with an accident that allegedly occurred on March 17th or not, and all evidence to the contrary, that nothing happened on March 17th. When the petitioner first saw it, Medicare actually ---- What does that have to do with notice? Because if the petitioner is going to claim that he hurt himself on March 17th, he would have to actually document that he hurt himself on March 17th in the record. No. He could, look, he could walk in and say to his employer, I had an accident today, and I hurt my leg, and it happened while I was delivering goods. And he could be an unmitigated liar when he tells it. But the fact of the matter, he's given notice. Now we go progress from notice, which is a jurisdictional issue, and then we go into the factual question of whether he proved accident. And what's this idea that where's the burden on the claimant to document on notice? I mean, isn't it normal procedure? An employee comes in and says, I just got injured on the job site, and there's human resources, et cetera. All of a sudden, our prior cases, we looked at these records, and it's Johnny on the spot, signed this, do that, see the nurse, whatever. So all notice is, I've informed an employer that I was injured while working. It can be very rudimentary.  I think I would move on to your other issue. Absolutely. Other than to say that when his employment files were submitted and both means did testify, that there's nothing in there to corroborate that any accident report was created. And I absolutely concede that a lot of employers tend to ignore or want to hide things. But when you look at the progression of the timeline and you get to the accident issue, it actually is not a step for them to ultimately conclude that they don't think he gave notice either, because they simply just don't believe him overall. But with respect to the timeline, he worked on March 17th, and there's no discrepancy there. He then continued working and worked all of his regular shifts and chose to go to the emergency room on March 29th, which was the last day of a three-day, regularly scheduled off period. The records indicate and the testimony even of the petitioner's witness indicate that she was with him when he went to the emergency room. And the history that was given is that it happened three weeks prior, which would not have been March 17th. It would have been March 8th or somewhere in that general period. Well, let's be realistic. Most of us don't live with a calendar. I mean, you know, you're at the end of the month. I think things happened two weeks ago or three weeks ago. I mean, it's in the same month. Yes, but if you believe the petitioner's witness's testimony, she was very adamant that she remembered that it was St. Patrick's Day adamantly because she was half Irish, she was scheduled to go out and party with her friends and her family, and that she couldn't go because she had to stay home and take care of him. That would be a probably memorable reason to remember St. Patrick's Day. Absolutely. And as I colloquially said to the commission when we argued this, I may not be Hispanic, but I know Cinco de Mayo. And the fact was the petitioner lived with a woman, if you believe her heritage, was half Irish and was all geared up to go out and party that night and couldn't because the petitioner came home. So that would be why he should have given March 17th, right? Absolutely. It's a specific date. I couldn't imagine how he couldn't remember it, but that's just a colloquial statement. Regardless of the fact, those medical records on March 29th also indicate when he gets there, he's complaining of both of his knees. And not only does he complain about them, they actually examine him and take x-rays of both of his knees. And at nowhere beyond that day does he ever talk about that he fell on both knees or any of that. And in fact, when he was asked about whether he'd hurt his right knee, he said no. And his witness was asked, when you looked at him when he came home on March 17th, did you notice anything about his right knee? And she said no, which then belies the question, why is he telling the emergency room that he hurt both knees? What was the acclaimed nature of the mechanics of the injury? In the emergency room records? No. Or the overall? In his testimony. In his testimony, it was that he was coming down the ramp of a wheel on the Dolly Road and he fell off but landed on his left knee. And how many feet did he fall? Four or five, I believe, is what he testified to. That's not a small distance, is it? No, it's not. Most people who fall have strains and sprains all over their body. True. But you do have his girlfriend who gives specifics about the nature of abrasions, etc., right? But only on his left leg. That's correct. And what's he seeking compensation for? Currently, in the claim in one he ultimately files at the left leg, but the first contemporary medical treatment is they examine him because he's complaining about pain in both of his knees. How many of us go to a doctor and we get the doctor for a site-specific diagnosis and say, oh, by the way, doctor, my toe hurts? And that's documented. Well, maybe, but they actually x-rayed his both knees. Of course they will. You think they turned down money? Come on. Come on. This is, you know, we've got an x-ray of the knee that's claimed to be injured. Am I correct? Correct. And that's what's at issue here? Correct. Okay. Let's focus on that. Okay. So you're trying to destroy his credibility because he gets the doctor to look at his right knee? Well, I'm destroying his credibility because the first contemporary medical history actually doesn't match what he's ultimately complaining about, and it's actually contradicted by his own witness testimony. Okay. Let's go focus on that. What's the contemporary? It's March 29th? Correct. Okay. And that contemporary, what does he say? Does he say anything? I didn't fall. I wasn't at work. He doesn't say anything about the dolly or the wheel or anything of that nature. He just says, I think he said, I got hurt at work three weeks ago and hurt both my knees. Can I ask you something? Absolutely. Don't the medical records establish, however, that he suffers from a condition of his left knee ill-being? I mean, isn't there – you're not saying that he never suffered any type of a medical problem, are you? You made up the whole thing. Isn't there medical records that document he does have a problem with his left knee? Well, he does have a problem with his knee, if you believe Dr. Markarian's testimony about the condition and the need for a surgery, which is contradicted by the respondent's Section 12 examiners. But there is some evidence for that. There is some evidence, but there's also a delay if you're looking at the totality of how this gentleman progressed on until he really begins active medical treatment. There's this significant delay of – he sees the emergency room on March 29th. They actually give him what would be the effective three days of off work status when he's supposed to ice his knee every four hours, which you couldn't do as you were driving a truck. But instead, he came to work. He worked his next scheduled days. He also then worked the entire month of April for all of his scheduled days. And at the end of April, there's a blowup between him and the employer, and he's terminated and no longer works there as of the end of April. However, on April 20th, he actually been to and saw Dr. Hussain for a separate issue that's not related to this claim. And that record was submitted because it shows that Dr. Hussain performed an entire physical examination and made specific findings in examining his bilateral lower extremities. There was nothing wrong with them. Everything was five out of five strength. There was no complaints, no nothing. He then goes, and there's an unknown period of time where who knows what the petitioner is doing, until he gets to Dr. Barron on June 14th. And he's not seeing Dr. Barron because of his knee. He's seeing Dr. Barron as part of that other claim that he was seeing Dr. Hussain for and mentions in that note, oh, and by the way, my left knee hurts. And so Dr. Barron documents that and sends him for an MRI, which he gets and shows some arguable pathology. And then Dr. Barron refers him for physical therapy. What he tells Dr. Barron on June 14th is that this injury occurred on February 1st, or in February. The physical therapy intake records on June 27th document February 1st as an accident date. The first time there's anything in a document anywhere that alleges March 17th as an accident date for the petitioner is that text message on July 7th from the petitioner's phone to one of the memes. And then two days later is the first history to a medical provider alleging that there was an injury on March 17th with the full description of I was coming down the ramp and the wheel fell off the dolly and then I fell. That's the very first history when he's already there for orthopedic evaluation. And then it's just a few days later that the application for benefits is filed that alleges that date. So from the first medical treatment on March 29th until a text message on July 7th, there's no documentation of anything to substantiate that the petitioner told the employer that I hurt myself on March 17th. And that's when I'm claiming this injury occurred. So with respect to the overall finding that there was no accident, part of that was, in fact, due to the credibility of witnesses. And it wasn't something brought out significantly, but it's actually in the record itself and it's in the exhibits. The petitioner actually submitted as his own exhibit two were his work logs that he created. He submitted them in the third to the last page in that exhibit is his job log or driver log, where he put down that from March 24th through April 22nd or 4th, he was off duty and couldn't work because he was sick with his knee. And that's what he submitted into evidence. However, not only did the respondent submit the work log showing that he worked before and after the alleged accident on March 17th, he worked all of his regular routes the entire month of April and his payroll submitted that he got fairly substantial payroll for April as well. So he created a driver log that he submitted into evidence that made up the fact that he claimed that he was off work the whole month of April. That's not credible. Separate from that, or in addition to that. Was that referenced by the commission or the arbitrator as to lack of credibility? As an item? I don't know if it's a specific reference, but it actually, it's obviously part, it was contradicted, but I believe it actually was. I'm not 100% positive, I apologize. But it clearly shows that he's submitting something and claiming that he's off work as a driver log to the court to, I don't know, I guess substantiate that he was injured, except that the contradictory evidence was that he actually worked that whole time and he did every route that he was supposed to do. So in light of all this, is it your conclusion that there is sufficient evidence in the record to support the commission's decision? Is that what you're telling us? Absolutely. It is not against the manifest weight of the evidence. The only time that this court would overturn that is if only the clearly opposite conclusion is warranted, and that's just not represented here. There's more than sufficient evidence in the record to support the decision. Okay. Unless your honors have any other questions. I don't believe we do. Thank you. Thank you very much. Counsel, you may reply. I'm glad you asked about the truck logs. Those truck logs were introduced in the evidence to show how he picked March 17th as his accident date, because he doesn't know when he sees Bayron what day it is. He doesn't know when he goes to Good Samaritan because he's a working man. So he looks through the records and he pins it down on March 17th. No, because the guy's a working man doesn't mean he has amnesia. Well, he isn't as attentive to detail as everyone in this room is. Hopefully I'm including that. Thank you for that. And hopefully myself as well. With those truck logs, he makes that truck log on March 27th of 2016. He writes down March 27th to April 24th, off work, sick leg. It's a projection. There's no dispute he worked during that period. That should not have been even, and to answer your question, that was acknowledged by the commission in the credibility assessment. But it was my point that that's improper evidence, because there's no dispute he worked during that period. If you're going to criticize this. So you're saying the creation of that looking into the future off work was done in March before that time period? He fills it out on March 27th. Okay. It's a projection. He thinks he's going to be off in April. He goes to the emergency room. He doesn't get the care from workers' comp. He sends the text message. He keeps working. There's no dispute he worked during April. I concede that. That's the whole point of this. Sir, let me ask you a pointed question. If the commission had ruled in your favor, notwithstanding all of these discrepancies in the medical records, misstatements, etc., that you've been pointing out, would we have been within our right to affirm the commission's decision? If they went the other way based on this evidence, what would be the ultimate outcome do you think? I'd be arguing everything from that side of the table. I'd be saying here's why all the evidence lines up. Well, isn't the law well settled that even though we might, having heard the case in the first instance, reach the opposite conclusion to that of the commission, isn't the determinative test? It's whether or not they have sufficient evidence to support their position. I think they have very little, if any, evidence to support the position. I don't think they have sufficient. If I was over here, I would say there's not sufficient evidence to overturn this. There may be a point here and there, a little bit here, something there, but not sufficient looking at the case in total. Can I ask you a quick point of clarification? I didn't glean from the briefs, but I'm wondering now, is there an argument that the recall of St. Patrick's Day the 17th was separate from the girlfriend because it was St. Patrick's Day and from the claimant in that he went back to his logs and determined it was the 17th? We didn't discuss this. So part of the argument is there was different recall of determining it was the 17th. Is that an argument you're making? Because I didn't glean that from the briefs. Yes, what happens is he doesn't figure out it's St. Patrick's Day until sometime after he looks at those logs, which is in June or July, before I filed the claim. Until that point, you know, whether he's Hispanic or he — there's no evidence that he knew about St. Patrick's Day, and that's why I think the Commission turned this thing on its head. They put the two of them together. Should she have known about it? Sure, she should have. She brought him to the emergency room. He goes into that emergency room. He doesn't know the exact date.  Does that answer your question? Yes, thank you. Two other points I wanted to raise based on Ms. Turnbull's statements. That February 1st, physical therapy date, when he goes — when the epilogue goes in to see Dr. Bayron on June 14th, it says February. I think it's fair to assume that when this came across the therapist's desk, they wrote February 1st. He doesn't tell Dr. Bayron February 1st. Bayron would have written February 1st. I think he just came in to Bayron and said three months ago or something like that, at the best of his knowledge. So I think that's where the February 1st comes. When Bayron's note says February 2016, it doesn't say three months ago. Correct. It says February — but I'm saying that that would be three months ago for — in my client's mind. I don't know it. How do you know what's in your client's mind? Because the only thing we know is what's in Bayron's record. Correct. Bayron's record says February. It didn't happen. I mean, the whole issue here is, did he actually have an accident while working that resulted in a condition for which he's entitled to benefits? And there's — I mean, they say based on the strength of this record, they deny that he had any accident at all. He didn't seek medical treatment for 12 days. Once he did seek medical treatment, he didn't seek medical treatment again from March till June. The doctor he went to for an unrelated back injury says he examined his legs. There was nothing wrong with them. It isn't until June that we get the first indication, past the March visit to the hospital, that he's got anything wrong with his legs. And then they've got an IME that says it's a degenerative condition. It wasn't caused by any trauma. And his complaints are way out of proportion to the objective findings. And then the commission turns around and says, we just don't believe this guy. Well, I think they don't believe him because of mistakes in fact that they made. Now, that April 20th, it's worth mentioning, that April 20th visit, he sees Dr. Hassan for a neck condition. This isn't a physical. He's following up on a neck problem that he had earlier in December from something that's unrelated. I understand that the doctor's notes make it look like there was a thorough physical given. But I would — I think common sense tells us he came in for the neck. The doctor didn't ask about the knee. Did the doctor make up all these things about the flexation of his knees and everything just to put in notes? I think it's just a — the readout I get was a routine visit for everything except the neck. It's not a full physical. And we know there's a problem with the leg at that time because he was there in March. The cat's out of the bag, so to speak, with the leg problem. He's there in March. He's there in June. The hospital said he had a cut on his knee. That's what the hospital said. He had a contusion to his knee. He had a cut. They had swelling. They cut his knee. They gave him ibuprofen. He goes to work. He continues to work. Works full duty, although he claims he's at a scale of 9 on 10. His pain is 9. He can't walk, according to him, on the day after. Continues to work. And then doesn't seek any additional medical treatment from March all the way through June. And the commission says, come on. Are we to hold it against this man? Well, Lieber says he's got a degenerative condition of his knee. It just wasn't caused by any accident. Lieber's map doesn't address the accident. He addresses causation. If we were here for causation, the commission wouldn't have done that. We understand that, except for one thing. If the only thing he had was a cut on his knee that he went to the doctor for at the hospital, they gave him a Band-Aid and some ibuprofen and sent him on his way and nothing else happened, now they're turning around and saying there was no accident. There just simply was no accident. I think the evidence says it wasn't a cut on the knee. He came in with a contusion. If it was a cut on the knee knowing the way that this man was working through all this, he wouldn't go to it. I think the girlfriend testified, I had to keep pushing him to come to the hospital. I think it was more than a cut on the knee. He was diagnosed with a contusion, a sprain. So it wasn't a simple Band-Aid, here, go home. They referred him out to other doctors. I wanted to finish with one thought. Yeah, because your time has gone over quickly. Okay. You asked about notice. If he's not there, if Mr. Chen is not asking can you come back to work with the notice, then what was it for? Why would I be here if it wasn't for the accident? That's two days after the emergency room visit. That's why Mr. Chen is asking about that, because he had this accident. Okay. I would rest my case. Thank you, Your Honor. Thank you. Thank you, counsel, both, for your arguments in this matter. A written disposition shall issue with the clerk.